IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| CODY KLINGLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-3066-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Cody Klingler seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred (1) in failing to give any

weight to the medical opinion of Barbara Mallin, M.D.; (2) in arbitrarily determining a

residual functional capacity; and (3) in finding plaintiff not credible. I find that the substantial

evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.

Therefore, plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.      BACKGROUND

On June 26, 2007, plaintiff applied for disability benefits alleging that he had been

disabled since January 1, 2006, a date he later amended to June 30, 2007 (Tr. at 32).

Plaintiff's disability stems from Crohn's disease.[1]  Plaintiff's application was denied on July 9,

---

[1]Crohn's disease causes inflammation and irritation of any part of the digestive tract, also
called the gastrointestinal (GI) tract. The part most commonly affected is the end part of the
small intestine, called the ileum. The GI tract is a series of hollow organs joined in a long,
twisting tube from the mouth to the anus. The movement of muscles in the GI tract, along with
the release of hormones and enzymes, allows for the digestion of food. In Crohn's disease,
inflammation extends deep into the lining of the affected part of the GI tract. Swelling can
cause pain and can make the intestine, also called the bowel, empty frequently, resulting in
diarrhea. Chronic inflammation may produce scar tissue that builds up inside the intestine to
create a narrowed passageway that can slow the movement of food through the intestine,

2007.  On June 29, 2009, a hearing was held before an Administrative Law Judge.  On

September 24, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the

Act.  On December 16, 2010, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

decision" of the Commissioner.  The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. §

405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v.

Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commission-

er's decision is supported by substantial evidence requires review of the entire record,

considering the evidence in support of and in opposition to the Commissioner's decision.

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666,

669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel,

143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission,

450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

However, the substantial evidence standard presupposes a zone of choice within which the

---

causing pain or cramps.

decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

3

4.       Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.       Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## A.    *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1992 through 2009:

| | |
|---|---|
| 1992 | $ 265.50 |
| 1993 | 540.88 |
| 1994 | 6,505.73 |
| 1995 | 5,923.88 |
| 1996 | 8,990.82 |
| 1997 | 16,545.23 |
| 1998 | 19,799.32 |
| 1999 | 22,189.68 |
| 2000 | 26,688.15 |
| 2001 | 8,841.74 |
| 2002 | 15,313.13 |

4

| | |
|---|---|
| 2003 | 6,562.68 |
| 2004 | 16,004.65 |
| 2005 | 16,764.63 |
| 2006 | 14,315.27 |
| 2007 | 5,735.44 |
| 2008 | 0.00 |
| 2009 | 0.00 |

(Tr. at 168).

## Function Report - Adult

In a Function Report dated August 14, 2007, plaintiff stated that a typical day entails getting up, trying to eat something, trying to do light house cleaning duties and laundry, then "try to do anything that in need around house sometimes out side lawn care." (Tr. at 213). Plaintiff cleans his cat's litter box every day and gives the cat food and fresh water (Tr. at 214). Plaintiff has no problems with personal care (Tr. at 214). Plaintiff is able to prepare his own meals (Tr. at 215). Asked what household chores, both indoors and outdoors, that plaintiff is able to do, he wrote, "Most things except for when I am in pain or sleeping from medicine." (Tr. at 215).

Plaintiff is able to walk, drive a car, and ride in a car (Tr. at 216). He can shop for an hour and a half (Tr. at 216). When asked if he finishes what he starts, he wrote, "yes" (Tr. at 217).

## B.   SUMMARY OF MEDICAL RECORDS

On August 14, 1995, plaintiff was diagnosed with Crohn's disease (Tr. at 698).

On November 13, 2005, plaintiff was seen at the Galesburg Cottage Hospital (Tr. at 572). He stated that he drank too much the night before -- 6 shots in 15 minutes. He still felt

5

bad the following day including nausea and vomiting. He rated his pain a 3 out of 10. He was assessed with alcohol gastritis[2] and dehydration.

Due to his Crohn's disease, on November 30, 2006, plaintiff saw gastroenterologist Barbara Mallin, M.D., on referral from Tom Landholt, M.D. (Tr. at 398-400). Dr. Mallin noted that plaintiff's recent flare of Crohn's was improved after treatment with Prednisone (corticosteroid) and Pentasa[3] (Tr. at 400). Dr. Mallin planned to make additional treatment recommendations after the initial workup was complete (Tr. at 400).

On January 22, 2007, plaintiff saw Erick Kaufman, M.D., a specialist in internal medicine (Tr. at 373-377). Dr. Kaufman noted that plaintiff had had Crohn's disease since he was a teenager.

> It wasn't appreciated until he had an intestinal rupture at the age of 18, and he was taken for urgent surgery. . . . He's had symptomatic illness treated off and on since that time. . . . The patient felt like his needs were not getting met at Dr. Landholt's office and wanted to have an internal medicine physician that could work closely with Dr. Mallin and this is the reason he's here today.

(Tr. at 374).

Plaintiff reported that glass had penetrated his left knee in the "distant past" (Tr. at 374). Plaintiff reported that he does not drink alcohol and that he was smoking a half pack of cigarettes per day. He was taking Pentasa and Prednisone. He was using Lortab (narcotic) rarely. "He's supposed to be taking Prilosec over the counter for GI protection, but hasn't done this yet." Plaintiff reported that he rarely gets headaches. Dr. Kaufman recommended Chantix to help plaintiff stop smoking. He told plaintiff to come back in three months for a follow up

---

[2]Alcohol gastritis is an inflammation, irritation, or erosion of the lining of the stomach caused by alcohol consumption.

[3]Treats ulcerative colitis -- a condition in which part or all of the lining of the colon (large intestine) is swollen or worn away.

6

on smoking cessation; six months for a follow up on Crohn's.

On March 13, 2007, plaintiff saw Dr. Mallin (Tr. at 369-370).  He weighed 167 pounds.  He had normal active bowel sounds.  "He notes that he is doing remarkably better" on Remicade (treats Crohn's disease).  His pain had "improved greatly."

> He still occasionally gets some mild right sided abdominal pain.  It is almost back to his normal.  He has gained 4 lbs.  He is having 2 bowel movements a day.  He is not having any fevers.  He denies any nausea or vomiting.

(Tr. at 369).  Plaintiff said he was trying to eat more frequently and eat healthier meals.  He was also working on quitting smoking and said he was "about to get his teeth fixed."   Dr. Mallin continued plaintiff on Remicade and Pentasa (Tr. at 370).  She told him to avoid non-steroidals, continue working on smoking cessation, and return in three months.

On June 14, 2007, plaintiff saw Dr. Mallin for a follow up of his Crohn's disease (Tr. at 365-366).   Dr. Mallin noted that plaintiff had been started on Remicade several months earlier and was doing much better.

> He states he rarely has any pain now.  He has 2-3 loose bowel movements a day, which is his normal.  He has not noted any rectal bleeding.  He has not had any weight loss and, in fact, has gained another pound.  He notes he does fairly well eating except with roughage.  He is having no nausea or vomiting.  He states that, over the last 2-3 months, he has only  had 3 twinges of pain, which he states just last for [a] few seconds then go away.

> He is very concerned as he was changed from full time to prn [as needed] at this job, which means he will loose [sic] his medical insurance.  He states that he has missed a fair amount of work over the last couple of months due to various colds. He states that when he does get a cold, it tends to linger on.

(Tr. at 365).  The treatment note indicated that plaintiff had Medicaid (Tr. at 421).  Dr. Mallin recommended that plaintiff continue on Remicade and "cautioned him not to miss a dose since this was the one medicine that seemed to really work for him" (Tr. at 366).  She "again strongly recommended that he quit smoking."  He was to avoid any roughage in his diet and take a multi-vitamin.

7

On June 20, 2007, plaintiff saw Dr. Kaufman for a follow up on smoking cessation (Tr. at 358-359). Plaintiff said he had not been able to get the Chantix because his insurance would not cover it. He was smoking more due to the stress of being moved to part-time and the expected loss of his health insurance. "[E]verything seems stable." Plaintiff was told to come back in January, i.e., in seven months.

June 30, 2007, is plaintiff's amended onset date.

On August 29, 2007, Dr. Mallin ordered a computed tomography (CT) scan of the abdomen and pelvis, and the radiologist, Jana Homer, M.D., observed that plaintiff had a fatty liver (Tr. at 418-419).

On September 12, 2007, plaintiff saw Dr. Kaufman with complaints of depression and difficulty with sleep (Tr. at 525). Dr. Kaufman noted: "He basically doesn't have any financial resources. He is applying for disability. He can't sleep very well. He feels down and depressed. He is asking for medication that would help him with this. I think Imipramine [antidepressant] would be a good choice to start with. We are also going to try to get him set up with some free individual counseling." The records show that plaintiff had Medicaid.

On October 2, 2007, plaintiff saw Dr. Kaufman who noted that plaintiff had "classic major depressive symptoms" that were improving with medication (Tr. at 523). "His self-esteem is improving, his concentration is improving, his sleep is improving. He still doesn't have much appetite. H[is] sleep is actually now normal. . . . He shows increase in psychomotor function. He actually can joke. His affect is more expanded." Dr. Kaufman noted that plaintiff's being on Medicaid was a "big relief for him," and she continued him on Imipramine (Tr. at 524).

On November 1, 2007, plaintiff saw Dr. Kaufman who noted that plaintiff had Medicaid (Tr. at 521). Plaintiff reported improved mood on medications but also complained

of migraines. "He has had these off and on in years past." Dr. Kaufmann increased plaintiff's Imipramine dose and told him to come back in four to six weeks.

On November 6, 2007, Dr. Kaufman completed a Medical Source Statement-Mental (Tr. at 412-414). Dr. Kaufman found that plaintiff was not significantly limited in the following:

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to sustain an ordinary routine without special supervision

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

9

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was markedly limited in the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

(Tr. at 413-414).

On November 15, 2007, plaintiff saw Dr. Mallin for a follow up on Crohn's Disease

(Tr. 416-417). She noted:

> Cody [has] fairly severe small bowel Crohn's disease. He returns today for follow up. He was started on Remicade several months ago and has noted a remarkable improvement. He has gained 10 lbs. over the last year. His bowel movements are more solidified, and this week, he is only having 2-3 bowel movements a day. His pain is also greatly improved, as well as his quality of life. He rarely has any problems with nausea and has not had any vomiting. He had noted some problems with Pentasa so has stopped this. This is making him have nausea and vomiting. Since he has stopped that, he has not had any other problems.

Plaintiff noted that he had almost stopped smoking but was "back to smoking" since his niece

has open-heart surgery. Dr. Mallin continued plaintiff on Remicade and B-12. "Again, we

have talked at length today about the importance of him stopping smoking." He was told to

come back in four months.

On March 25, 2008, plaintiff saw Dr. Mallin for a follow up (Tr. at 533). She noted

that he was feeling well and had been having only two bowel movements a day with decreased

pain. "[A] couple of weeks ago, he developed flu-like symptoms and had up to 10-12 bowel

movements a day. This was associated with left sided abdominal pain. He also had fever and

body chills. Over the last week, this has been improving. He is now down to 3 bowel

movements a day. He is only having slight periodic left sided abdominal pain." Plaintiff had cut down to a half a pack of cigarettes per day. Plaintiff had gotten Dental Medicaid but had not had his dental work done yet. "He has multiple teeth that need to be removed." Dr. Mallin told him to restart Ranitidine (reduces stomach acid) and come back in four to five months.

On April 10, 2008, plaintiff saw Dr. Kaufman for a follow up on Crohn's (Tr. at 514-515). "He has a hard time maintaining his weight, secondary to poor dentition. He has found a dentist who is hopefully going to get approval from Medicaid to pay for his extractions and then he will need full dentures. He has significant financial impairment and cannot afford this himself. He has applied for disability, but initially was denied. He is still smoking, and trying to cut down, and hopefully quit, but he cannot afford the Chantix quite yet." Dr. Kauffman noted that plaintiff was "doing well" on his present Crohn's therapy. He "strongly encouraged" plaintiff to quit smoking. "Extremely poor dentition, causing trouble maintaining adequate oral intake. Recommended extraction and dentures." Finally, he noted that plaintiff was doing well with depression and insomnia with Imipramine. Plaintiff was told to return in three to six months.

On June 18, 2008, plaintiff was admitted to the Cox Medical Center, Springfield, Missouri (Tr. at 444-481). He initially went to the emergency room with complaints of abdominal pain, nausea, vomiting, and cramping. He had not had a bowel movement for the past approximately 24 hours. A CT scan revealed possible partial or nearly complete small bowel obstruction. Plaintiff reported that he had recently gotten married, he smokes up to a pack of cigarettes per day, and he "works in an auto mechanic shop." (Tr. at 445). Plaintiff reported that over the past several months he had had "intermittent abdominal pain and cramping but these were short-living episodes". Plaintiff was placed on steroid and medication treatment, but by his third day in the hospital the treating doctor decided to

11

perform surgery. By the fifth day he was eating and having normal bowel movements and was discharged home on June 26, 2008.

On August 1, 2008, plaintiff saw Dr. Kaufman for a follow up (Tr. at 509-510). Dr. Kaufman noted evidence suggesting the presence of asymptomatic lymphoma and questioned whether plaintiff should stay on Remicade. "He is treated for depression and is doing well." Plaintiff stated that he had not been able to get any dental extractions or dentures because he could not afford them.

On August 25, 2008, plaintiff saw Robert J. Ellis, M.D., an oncologist, for new patient evaluation and further evaluation of the pathology report suggesting the presence of B-cell lymphoma (Tr. at 552-559). Plaintiff was still smoking a pack of cigarettes per day. He was observed to have "poor dentition with a fractured tooth." Dr. Ellis prescribed Lortab (a narcotic) to help with "colicky abdominal pain" and with loose stools and recommended plaintiff have a PET and CT scan[4] and bone marrow aspiration[5] and biopsy.

On August 26, 2008, plaintiff saw Dr. Mallin for a follow up (Tr. at 530). She noted that laboratory evidence from plaintiff's surgery in June revealed the presence of B cell lymphoma, which rendered him ineligible to restart Remicade. She noted that "[h]e is very distraught about this as this medicine has helped him more than anything else." Until recently plaintiff had done well since his surgery, but he now complained of left side abdominal pain and reported four to five loose stools per day. He also reported being very anxious and unable to sleep. Dr. Mallin ordered a CT scan to rule out a flare of Crohn's disease. In view of

---

[4]Positron Emission Tomography (PET) and Computed Tomography (CT) imaging are diagnostic tools physicians use to reveal the presence and severity of cancers.

[5]Bone marrow is the soft tissue inside bones that helps form blood cells. It is found in the hollow part of most bones. Bone marrow aspiration is the removal of a small amount of this tissue in liquid form for examination.

12

plaintiff's suspected malignancy, Dr. Mallin was very uncertain as to how to manage his Crohn's and intended to consult with other physicians at Barnes Jewish Hospital or KU Medical Center.

On September 2, 2008, plaintiff underwent a nuclear medicine PET/CT scan and bone marrow aspiration and biopsy (Tr. at 548-551). The results were negative: "no evidence for metabolically active lymphoma." Plaintiff also underwent a CT scan of the abdomen and pelvis, as ordered by Dr. Mallin (Tr. at 528-529). The radiologist, Dr. Fancher, found no sign of significant inflammatory bowel disease, no sign of abnormal fluid collection no sign of abdominal wall hernia.

On October 18, 2008, plaintiff underwent a Medicaid Psychological Evaluation for the Family Support Division to determine whether he had a "mental disorder and/or impairment, and whether he has the functional capacity for being able to return to work" (Tr. at 536-537). Licensed psychologist Craig Shifrin, Psy.D., conducted the evaluation utilizing clinical interview and the Wechsler Adult Intelligence Scale - III (measures intellectual functioning).

Plaintiff told Dr. Shifrin that he had experimented with acid when he was 17. He drank alcohol in an abusive manner until approximately two years ago when he suffered alcohol poisoning. Plaintiff said he was discharged from the Navy after two months for not disclosing a knee injury and for having a "personality disorder." Plaintiff said he had Crohn's disease and had been diagnosed with cancer.

Dr. Shifrin summarized plaintiff's employment history: he worked in a video store as a clerk then as an assistant manager but left that job when the company closed. His next job was in a pork plant, and he left that job after he cut through his thumb. He worked at Hardees for a year and a half and left that job for a better job as a roofer. He was "let go" after a month for reasons "he was not clear about or understood." He then worked for four years in a

13

refrigerator factory and left that job when the factory closed. He worked at a cable company for two months and left that job to work for his brother. Plaintiff worked for his brother for two years, but then his brother had to close the business. Plaintiff worked at a temporary agency for two years then worked on a pig farm for a year before moving to Springfield. Plaintiff worked at the Developmental Center of the Ozarks until he was "forced to quit due to having attendance problems because of his colitis illness."

Plaintiff's IQ was measured at 93 which is the low end of average. Dr. Shifrin concluded that, "Based on Mr. Klingler's self-report and the clinical interview, he does not have a severe enough mental disability that would qualify him for receiving Medicaid support." He was assessed with adjustment disorder with depressed features resulting from medical pain.

On November 3, 2008, plaintiff underwent medical evaluation by Dorinda Faulker, M.D., for Medicaid (Tr. at 612-614). Plaintiff reported that he was recently diagnosed with B-cell lymphoma was "is currently on chemotherapy." He said he has about four bowel movements per day. He was smoking 3/4 pack of cigarettes per day, reported drinking alcohol about two to three times per year, and "very seldom" used marijuana in the past.

Plaintiff reported he can walk around a WalMart Supercenter one time, he can sit for 20 minutes at a time and for a total of an hour. During exam, plaintiff's abdomen was "too tender for proper evaluation." Dr. Faulkner concluded that, "Based on the information provided and evaluation of patient, I believe it is functionally disabled for work at this time."

On November 20, 2008, plaintiff saw Dr. Ellis (Tr. at 542-543). She wrote: "Lymphadenopathy [disease of the lymph nodes] - not proven to be lymphoma[6] based on

_____

[6]Any neoplastic disorder of lymphoid tissue, often used to denote malignant classifications of which are based on predominant cell type and degree of differentiation; various categories

14

second opinion.  I still want to follow him back with serial scans. The plan will be for scans to be done in April [i.e., in five months] and see him back in another year for more scans.  If he remains stable, then we can consider discharging him from the clinic."

On December 2, 2008, Dr. Kaufman prepared a "Medical Source Statement-Mental" (Tr. at 561-562).  Dr. Kaufmann found plaintiff "extremely limited" in every single category on the form:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

_____

may be subdivided into nodular and diffuse types depending on the predominant pattern of cell arrangement.

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

"Extremely limited" is defined on the form as "impairment level preclude[s] useful functioning in this category".

Dr. Kauffman also prepared a "Medical Source Statement-Physical" (Tr. at 564-565). He wrote "N/A" as to physical strength factors, postural and manipulative factors, and environmental factors. The only limitation he expressly noted was plaintiff's need to lie down daily due to pain. When asked whether plaintiff's pain, use of medication, or side effects of medication cause a decrease in concentration, persistence, or pace, or any other limitation, he checked, "Unknown" (Tr. at 565).

On December 3, 2008, plaintiff had a CT scan of his abdomen and pelvis due to abdominal pain (Tr. at 621-622). The radiologist, Earl Maes, M.D., assessed nonobstructive bowel gas pattern without free air or free fluid. He observed enlarged lymph nodes and lymph nodes scattered throughout the mesentery. "Given history of lymphoma recommend a Nuclear Medicine PET/CT examination to evaluate these areas further."

On December 5, 2008, plaintiff saw John K. Kreymer, Psy.D., after having been referred by his disability attorney (Tr. at 712-714).

16

Says he has Medicaid now, but still up for determination. Seeking counseling per a psychiatrist's recommendation. He says he does not understand the psychiatrist's recommendation. Saw psychiatrist as part of re-determination for Medicaid.

Currently on medical restrictions - not medically cleared to work at this time.

\* \* \* \* \*

Says does not like or want pain meds. Afraid of what other people will think as well about his using pain meds.

\* \* \* \* \*

He said he does have depression, insomnia - for about 2 years. PCP - prescribed meds → Current meds = Cymbalta, Ambien (PRN) [as needed]. Cymbalta for 2 days as of this writing. Says he is scared to take Ambien.

"Just worried - I don't know if I can go back into pain like I was before." Pain - pulling sensations, swelling, hyperalgesia - abdomen. Nagging pain at times, other times pulling/punching sensation. What helps? -- "curling up in a ball".

\* \* \* \* \*

Filing for disability. Has applied for jobs -- says no one will hire him because of his Crohn's disease. Applying for "anything and everything."

\* \* \* \* \*

Used to drink ETOH [alcohol] heavily - "I've all but entirely quit". Says will have a drink on a special occasion. Drinks coffee, soda, water. Used to smoke MJ [marijuana], infrequently use[s] MJ now. Tobacco - now 1 pk/day. Says had quit after surgery but start again - when told he had cancer. He knows cancer and smoking go together. He wants to quit.

Dr. Kreymer diagnosed mood disorder, not otherwise specified ("296.9"). He planned

to continue plaintiff on his "psych meds", work with him on coping and depression, and told

him to follow up with his oncologist and a dietary consult. Plaintiff did not return to Dr.

Kreymer.

On December 18, 2008, plaintiff saw Dr. Mallin for a follow up (Tr. at 637-638).

Dr. Mallin noted that plaintiff was diagnosed with B-Cell lymphoma; however, after a second

opinion that diagnosis had been questioned. Plaintiff had been put on medication to take the

17

place of the Remicade, but he reported left upper quadrant pain (which was determined at the emergency room to be gas) and diarrhea. He continued to have the left upper quadrant pain and diarrhea and had an appointment with Dr. Ellis set for the following week. He described his pain as a 4 out of 10 and said it started two to three weeks earlier. Plaintiff continued to smoke. Plaintiff's wife reported that plaintiff was having some difficulties with his memory. "He also reports he has not had his Methotrexate for the last two weeks and has not been taking his Folate. His Ciprofloxacin ran out, and he has not refilled this."

Dr. Mallin changed plaintiff's medication to see if his memory problem, diarrhea and pain improved. She recommended stool studies. "Again, I have recommended that Cody stop smoking." She told him to follow up with her in a couple of months.

On December 29, 2008, plaintiff underwent a repeat nuclear medicine PET/CT scan for lymphoma restaging (Tr. at 619-620). This study was negative, showing no evidence of metabolically active lymphoma (Tr. at 620). He also saw Dr. Kaufman for a follow up (Tr. at 651-652). Plaintiff had not yet gotten the results of his PET scan and was nervous about it. "It is hard to know what the significance of this abdominal pain is; Crohn's, low grade pancreatitis, etc. We will wait for the results of the imaging today. We will continue to refill his hydrocodone [narcotic] as needed in the short term for uncontrolled pain. I think the Cymbalta seems to be working well for him. I will leave him on 60 milligrams and check him in a week or two and review his studies."

On January 8, 2009, plaintiff saw Dr. Kaufman for a follow up (Tr. at 648-649). Plaintiff's chief complaint was pain. "He ran out of the hydrocodone a few days ago. We phoned in a refill two days ago, but he has not checked back with the pharmacy yet." Plaintiff was "doubled over, groaning and holding his abdomen." Plaintiff told Dr. Kaufman that he was seeing a psychologist who was helping him with his coping skills. Dr. Kaufman refilled

18

plaintiff's medications and told him to come back in a month.

On February 5, 2009, plaintiff underwent an esophagogastroduodenoscopy[7] performed by Dr. Mallin after having been referred by Dr. Kaufman due to "severe upper abdominal pain" (Tr. at 721-722). Findings were generally unremarkable, except for showing a hiatal hernia.[8] Dr. Mallin recommended plaintiff continue Prilosec (an acid reducer) and have a gallbladder ultrasound and small bowel follow-through as the cause of his "severe upper abdominal pain" had not been determined with this test.

On February 12, 2009, plaintiff saw Dr. Kaufman for a one-month follow up on abdominal pain (Tr. at 645-646). "[I]n June there was a question as to whether or not there might have been a little bit of lymphoma. He has had a recent computerized tomography scan/PET scan. The report says there was a 7.5 centimeter mass, but in fact that is a mistake. I reviewed the scan and images, and there is a 7.5 millimeter lymph node." Dr. Kaufman observed that plaintiff was "writhing in pain, holding his abdomen and finds a hard time getting comfortable." However, plaintiff was "not presently pharmacologically treated for his Crohn's disease" despite reporting "diarrhea stooling four to six times a day." Plaintiff reported having "drenching night sweats every few days." Dr. Kaufman assessed "abdominal

---

[7]A test to examine the lining of the esophagus (the tube that connects the throat to the stomach), stomach, and first part of the small intestine. It is done with a small camera (flexible endoscope) which is inserted down the throat.

[8]A hiatal hernia occurs when part of the stomach pushes upward through the diaphragm. The diaphragm normally has a small opening (hiatus) through which the food tube (esophagus) passes on its way to connect to the stomach. The stomach can push up through this opening and cause a hiatal hernia. In most cases, a small hiatal hernia does not cause problems, and a patient may never know he has a hiatal hernia unless a doctor discovers it when checking for another condition. But a large hiatal hernia can allow food and acid to back up into the esophagus, leading to heartburn.
http://www.mayoclinic.com/health/hiatal-hernia/DS00099

Case 6:11-cv-03066-REL   Document 16   Filed 05/30/12   Page 19 of 46

pain, severe, persistent, etiology unknown" and directed that plaintiff have a small bowel x-ray

series and gall bladder ultrasound as recommended by Dr. Mallin, blood work, and continue

opiate analgesics.

On March 9, 2009, Ryan Fields, M.D., of Barnes Jewish Hospital, wrote a letter to Dr.

Ellis after having seen plaintiff (Tr. at 626-627).

> [I]n June of 2008, he had a small bowel obstruction resulting in exploratory
> laparotomy, partial colectomy, and distal small bowel resection, and at that time his
> pathology demonstrated a B-cell lymphoma. Since June of 2008 he had not been on any
> immunosuppressive medication for his Crohn's disease and at that time was referred by
> a gastroenterologist for further management as well as a referral to Medical oncology
> for possible treatment of his B-cell lymphoma. His pathology was reviewed here and he
> was seen by Dr. Nancy Bartlett [an oncologist]. The feeling at that time was that there
> was no evidence of active lymphoma, either based on imaging, laboratory tests, or a
> review of his pathology. He was not treated at that time. However, Remicade was
> avoided for his Crohn's disease due to its association with secondary lymphomas. Since
> his surgery in 2008, he has had some continued vague abdominal pain that he says has
> improved over the past week but is still present. He has had no nausea, vomiting, no
> weight loss, no fevers, chills, no night sweats,[9] no diarrhea.[10] . . . [H]e has had multiple
> CT scans, the most recent which was in December 2008 . . . which demonstrate
> multiple mesenteric intraabdominal lymph nodes, the largest of 1.7 centimeters,
> slightly enlarging on studies. A PET CT scan performed more recently was negative and
> did not show any metabolic activity in these lymph nodes. He is thus referred for
> possible tissue biopsy to establish any diagnosis of malignancy.

> \* \* \* \* \*

> SOCIAL HISTORY: He is currently employed. Smokes about one pack per day for
> approximately 20 years. . . .

> PHYSICAL EXAMINATION: He is alert and oriented x 3 in no apparent distress. . . .

Dr. Fields recommended plaintiff return for another CT scan since Dr. Fields was

unable to pull up the actual images on the ones plaintiff brought to this appointment.

---

[9]Less than a month earlier, plaintiff told Dr. Kaufman that he experienced "drenching night
sweats" every few days.

[10]Less than a month earlier, plaintiff told Dr. Kaufman that he experienced diarrhea four to
six times per day.

On March 20, 2009, plaintiff was examined by William Hawkins, M.D., at Barnes Jewish Hospital on referral from his oncologist, Nancy Bartlett, M.D., for possible B-cell lymphoma (Tr. at 624). Dr. Hawkins observed that plaintiff was in no acute distress. He told plaintiff that a multidisciplinary board would review his case to determine the best course of action.

On March 26, 2009, plaintiff saw Dr. Mallin for a follow up (Tr. at 630-631). Plaintiff said he had not had any improvement with his pain despite having been put on Prednisone. He said his pain was a 2 on most days but could get up to a 4 to 6. "Last week he had diarrhea but this week he is back to one bowel movement a day." Dr. Mallin noted that it was a "dilemma as he has had a good response to Remicade in the past but has not been on this secondary to the possible diagnosis of B-cell lymphoma." Plaintiff was observed to be in no acute distress and rated his current pain as a 3 out of 10. However, he then said "it is really only a 2 because he has a high tolerance of pain." Dr. Mallin wrote, "Again, I have urged him to stop smoking." She ordered a blood test to see if there was any evidence of active inflammation and told him to come back in three months after hearing from Barnes Hospital.

On April 20, 2009, plaintiff saw Dr. Kaufman with complaints of left knee pain (Tr. at 640-641). He had gone to urgent care where x-rays were negative. He was given crutches and within a few days he was "dramatically better and he still has been. There is just minimal discomfort". Plaintiff's physical exam was normal. Dr. Kaufman concluded that plaintiff's complaints may have stemmed from a temporary dislocation that had "dramatically improved."

On April 28, 2009, plaintiff saw Dr. Mallin for a follow up on abdominal pain (Tr. at 738-739). Plaintiff reported diarrhea for the past four to six weeks, "but when I questioned him about this, he stated that it really had just been going on for a week or two." Dr. Mallin

21

noted that plaintiff was noncompliant with several of his prescribed medications; he ran out of

needles needed for B-12 injections; he stopped Prednisone; and he ran out of Prilosec. Plaintiff

reported no improvement with Entocort (treats Crohn's disease) and Pentasa. He described his

pain as a 4 but said eating could make it a 7. Dr. Mallin ordered a colonoscopy to evaluate

whether plaintiff's pain complaints were related to a flare of his Crohn's disease versus some

irritable bowel symptoms.

In a letter dated May 1, 2009, Dr. Mallin wrote to plaintiff's attorney:

This letter is in regards to the health condition of Cody Klingler. I have followed Cody for Crohn's disease since November of 2006. His symptoms, in the past, have mostly been abdominal pain and intermittent bouts of diarrhea. This condition is one where a patient will have bouts of active disease with periods of remission. Cody did require surgery last year for a bowel obstruction. At that time, there was a questionable finding of a B-cell lymphoma that is currently being investigated in St. Louis. Cody functions fairly well when his Crohns is in remission, but does not when his disease is active.

(Tr. at 673).

On May 12, 2009, Dr. Hope Rasque, plaintiff's surgeon, completed a "Medical

Source Statement-Physical" (Tr. at 742-743). She found that plaintiff could lift and carry 25

pounds frequently, stand for eight hours, and sit for two hours. He had an unlimited ability to

push and pull. He could occasionally climb, balance, and crawl; he could frequently stoop,

kneel, crouch, reach, handle, finger, feel, see, speak, and hear. He should avoid moderate

exposure to extreme cold, extreme heat, weather, humidity, dust, fumes, vibration, hazards,

and heights. He should avoid concentrated exposure to weather.

On May 18, 2009, plaintiff underwent a colonoscopy[11] with hot biopsy[12] and a

---

[11]A test that allows the doctor to look at the inner lining of the large intestine.

[12]A technique for removing polyps.

22

polypectomy[13] and cold biopsies[14] (Tr. at 762-763).  Dr. Mallin, who performed the procedure, noted that she would discuss further treatment with Dr. Hawkins in St. Louis, because plaintiff's  questionable lymphoma restricted him from Remicade, the only medication that had worked for him.  She continued him on his current medications, including Pentasa and Entocort.

On May 18, 2009, John Kreymer, Psy.D., completed a Medical Source Statement - Mental (Tr. at 745-746).  Dr. Kreymer found that plaintiff was not significantly limited in the following:

- ▪ The ability to remember locations and work-like procedures

- ▪ The ability to understand and remember very short and simple instructions

- ▪ The ability to understand and remember detailed instructions

- ▪ The ability to carry out very short and simple instructions

- ▪ The ability to make simple work-related decisions

- ▪ The ability to interact appropriately with the general public

- ▪ The ability to ask simple questions or request assistance

- ▪ The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- ▪ The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- ▪ The ability to respond appropriately to changes in the work setting

---

[13]Removal of a polyp by surgery.

[14]The monopolar hot biopsy technique is a widespread method of removing and cauterizing small colonic polyps.  Due to the insulated cups of the biopsy forceps, it also allows adequate histological interpretation of the resected specimen.  However, polyps removed using the monopolar hot biopsy technique have been less histologically interpretable in comparison with polyps removed using cold biopsy forceps.

23

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

Dr. Kreymer did not find that plaintiff was "markedly limited" or "extremely limited" in any

area.

On June 11, 2009, plaintiff underwent "laparoscopic converted to open lymph node

biopsy of the right lower quadrant" at Barnes Jewish Hospital, performed by William Hawkins,

M.D. (Tr. at 792-797). Dr. Hawkins wrote that plaintiff:

suffers from inflammatory bowel disease. His disease was well controlled on Remicade. However, there is a risk of lymphoma developing on Remicade. When he was found to have enlarged lymph nodes, his Remicade was held because the doctors were worried about the possibility of development of lymphoma. . . . He really desires going back on the Remicade. The doctors will consider treating him with Remicade if these enlarged lymph nodes prove to be non-malignant.

The surgical pathology report noted in pertinent part "no lymphoma seen" (Tr. at 796).

On June 17, 2009, plaintiff was admitted to hospital for postoperative ileus[15] (Tr. at 750). He was given "bowel rest" and then later started on a clear liquid diet. After two days he was a "great deal better" and was discharged.

On June 30, 2009 -- three weeks after his surgery -- plaintiff underwent a CT scan of the abdomen and pelvis (Tr. at 748-749). The impression was improving postoperative changes.

## C.     SUMMARY OF TESTIMONY

During the June 29, 2009 hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

### 1.     Plaintiff's testimony.

Plaintiff lives with his wife and his 18-year-old step son (Tr. at 44). Plaintiff's wife supports the family (Tr. at 44).

Plaintiff testified that he is unable to work because his Crohn's disease makes it impossible for him to guarantee that he could go to work every day (Tr. at 32). Plaintiff was working two jobs until Memorial Day weekend in 2007 (Tr. at 32). He worked full time as a classroom assistant and he worked part time as a clerk at a convenience store (Tr. at 33). After Memorial Day weekend in 2007 he lost his job at the convenience store (Tr. at 33). He was told he was laid off but he "heard a couple of different things" (Tr. at 33). At the same time, his full-time job was reduced to part time on call because he was sick (Tr. at 33). He was on Remicade treatments which made him extremely weak, sickly, hurting, and unable to function for a day or two (Tr. at 33). He was "off" for about a week but he was "home sick anyway" (Tr. at 33). His employer called him to see if he could come into work and he was unable to so

---

[15]Ileus is a partial or complete non-mechanical blockage of the small and/or large intestine.

Case 6:11-cv-03066-REL   Document 16   Filed 05/30/12   Page 25 of 46

he was terminated (Tr. at 34). He was described as an unreliable worker (Tr. at 34).

Plaintiff has been treated for Crohn's Disease since as early as 1995 (Tr. at 34). He has good days and bad days (Tr. at 34). On a good day, he can get up and do housework in moderation; on a bad day he is not capable of doing anything (Tr. at 34-35). He cannot drive himself "to the gas station to get a soda or something" (Tr. at 35). He lies around and barely eats anything (Tr. at 36). In the last three weeks, plaintiff has only had about two good days per week (Tr. at 35).

Plaintiff was a patient at Barnes-Jewish Hospital from June 11-13, 2009 (Tr. at 27). Plaintiff had surgery in June the year earlier for a resection of his small and large intestine due to Crohn's (Tr. at 27). The surgeon found some cancerous lymph nodes and removed them (Tr. at 27). The most recent surgery was to make sure he was still cancer-free (Tr. at 27). Plaintiff has had three surgeries on his lower abdomen (Tr. at 27). He has been on B12 shots since 1995 or 1996 because the part of his intestines that absorbs B12 naturally "no longer exists" (Tr. at 38).

The ALJ asked plaintiff about his smoking:

Q.      How much are you smoking?

A.      Well, I'm in the process of trying to quit right now. I'm smoking about three or four a day if that.

Q.      Well your cigarette smoking is pretty substantial. When did you start dropping down?

A.      Well I had effectively quit in June of last year for a short time.

Q.      How effective is that?

A.      Well I actually did not smoke for about three weeks at all. And then I --

Q.      So you quit for three weeks and then you started up again the same month that you quit?

Case 6:11-cv-03066-REL   Document 16   Filed 05/30/12   Page 26 of 46

A.    Well [it] was July when I first started back up.

Q.    Okay. All right. Okay and then you were smoking how much?

A.    Started out a couple, three cigarettes a day and then it's gotten up to about a half pack a day since then. And then --

Q.    Sir, I have your records right here. You sure that's your answer?

A.    I know I did get up to a pack fairly recently I guess, something like that. But I know I have gotten to the point that some days I got to pack and a half even at times. But that's when I figured that yeah, I have to start cutting back and try to quit.

(Tr. at 28-29).

Plaintiff admitted that his smoking affects his Crohn's disease and his irritable bowel syndrome (Tr. at 29-30).

Q.    Do you think your smoking has anything to do with [being unable to work due to Crohn's disease]?

A.    Yes, sir, that's why I'm trying to quit. It very well does have an effect on it.

(Tr. at 32).

No one has ever told him that his drinking affects those impairments (Tr. at 30). Plaintiff testified that he drank heavily until 2005 and now only drinks every once in a very great while (Tr. at 30).

Plaintiff has been told that his dental condition, which he has not gotten fixed, affects his Crohn's, or at least his body's ability to chew and "process stuff" (Tr. at 31). Plaintiff has not been on any dietary restrictions other than to consume what is "tolerated" (Tr. at 46). He consumes about one soda per day (Tr. at 47). He has not been told to cut out soda or caffeine - he has only been told to consume those things in moderation (Tr. at 47). Plaintiff drinks two to three cups of coffee in the morning and about two cups of coffee at night (Tr. at 48).

27

On a typical good day, plaintiff uses the bathroom eight to ten times (Tr. at 36). On a bad day, plaintiff will need to use the bathroom around 20 times (Tr. at 36). Plaintiff does not wear any kind of protective undergarments (Tr. at 46). Plaintiff is aware of no triggers other than smoking that make his Crohn's worse (Tr. at 37). Lying down and hugging a pillow to his abdomen will help with the pain, but the nausea is only helped by not eating (Tr. at 37). On a good day, plaintiff lies down once a day for 20 to 30 minutes (Tr. at 37). On a bad day, he spends most of the day in bed (Tr. at 37).

Plaintiff was diagnosed with benign B cell lymphoma (Tr. at 37-38).

Plaintiff sees Dr. Kaufman for depression every three to six months for 20 to 60 minutes (Tr. at 31). He saw Dr. Kramer for counseling in December 2008 but stopped seeing him due to religious differences (Tr. at 45). He has not found another counselor as of yet, although he testified that he started looking two weeks after he stopped seeing Dr. Kramer (Tr. at 45 46). Plaintiff has suffered from insomnia for about 15 years (Tr. at 38). At first he had difficulty sleeping about one night out of three or six months (Tr. at 38-39). In the past three to four years, it got to the point where he had trouble sleeping one night a week (Tr. at 39). Now it is about two nights a week (Tr. at 39). His medication works most of the time (Tr. at 39).

On a good day, plaintiff can stay focused for about an hour and a half to two hours (Tr. at 40). Other days he cannot even concentrate long enough to cook an egg (Tr. at 40). Plaintiff does not have problems starting things; but he gets jittery, nervous, and unfocused and is sometimes unable to finish (Tr. at 40).

Plaintiff has panic attacks which last for 20 to 30 seconds (Tr. at 40-41). It takes him five to ten minutes afterward before he is OK (Tr. at 41). His fear of spiders bring on panic attacks (Tr. at 41). He has had about two panic attacks in the past couple of weeks (Tr. at 41).

28

Plaintiff has a driver's license (Tr. at 42). On a good day he can drive for 20 to 30 minutes at a time (Tr. at 42). Plaintiff can sit for 20 to 30 minutes at a time, but on bad days he cannot even sit still for a few minutes (Tr. at 42). He was told after his surgery to limit lifting to the weight of a gallon of milk (Tr. at 42).

Plaintiff has no side effects from his medication (Tr. at 41).

## 2. Vocational expert testimony.

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge. Plaintiff has listed 17 different jobs, but only five of them were done at the substantial gainful activity level: clerk cashier, appliance assembler, fast food worker, electrical equipment installer, and teacher's aide (Tr. at 54, 56).

The first hypothetical involved a person who could perform light work but could not push or pull levers repetitively with his upper or lower extremities. Repetitively was defined as constant movement for a period of not less than five minutes. He could frequently bend, twist, turn, or climb stairs; he could occasionally crawl, stoop, squat or kneel. He could not use air or vibrating tools; work in ambient environments containing constant dust, smoke or fumes; or work at unprotected heights. He would have a mild limitation in his ability to understand, remember or carry out complex instructions or make judgments on complex work related decisions and on interacting with the public, coworkers or supervisors. This is based not on a mental limitation but on the possibility of soiling himself which may cause anxiety issues. With protective undergarments the person could use normal breaks to deal with the possibility of soiling himself (Tr. at 57-58). The vocational expert testified that such a person could perform plaintiff's past relevant work as a cashier clerk, fast food worker, or teacher's aide (Tr. at 58).

29

The second hypothetical was the same as the first except the person could only do sedentary work instead of light work (Tr. at 59). Such a person could not do any of plaintiff's past relevant work, but he could work as a table worker, D.O.T. 739.687-182, with 32,000 in the nation and 650 in the region; an adresser, D.O.T. 209.587-010, with 121,000 in the nation and 2,300 in Missouri; or a general assembler, D.O.T. 734.687-018, with 143,000 in the nation and just over 4,000 in the region (Tr. at 59).

The third hypothetical involved a person who would miss work or be late or have to leave early up to twice per month (Tr. at 60). The vocational expert testified that typically an unskilled or semi-skilled position earns about 1.75 days of all forms of leave per month, so if the person would need to use two entire days of leave per month, he could not keep a job (Tr. at 60).

If the person would need frequent unscheduled breaks -- from 8 to 20 times per day, then the person could not work (Tr. at 60-61).

The final hypothetical involved a person with "marked limitation . . . resulting in limitations that seriously interferes [sic] with the ability to function independently. If you have a marked limitation in the ability to perform activity within a schedule, maintain regular attendance and be punctual within customary tolerances", the person could not work (Tr. at 61-62).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge James Francis Gillet entered his opinion on September 24, 2009 (Tr. at 10-21). The ALJ found that plaintiff meets the insured status requirements through December 31, 2012 (Tr. at 12).

30

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date[16] (Tr. at 12).

Step two.  Plaintiff has the following severe impairments:  hiatal hernia, gastroesophageal reflux disease, left lower extremity pain, mild hepatomegaly, insomnia, nicotine addiction, generalized anxiety disorder with agoraphobia, status post surgery for nonacute lymphoma, Crohn's disease with a resection and anastomosis, headaches, reactive depression and an adjustment disorder with depressed features (Tr. at 12).  Plaintiff's ulcerative hemorrhoids, dental abscesses and knee pain are not severe impairments (Tr. at 12).

Step three.  Plaintiff's severe impairments do not meet or equal a listed impairment (Tr. at 13).

Step four.  Plaintiff's subjective limitations are not entirely credible (Tr. at 19).  Plaintiff retains the residual functional capacity to perform sedentary work except for pushing or pulling levers with the upper and lower extremities repetitively.[17]  He can occasionally crawl, stoop, squat or kneel.  He can frequently bend, twist, turn and climb.  He cannot use air or vibrating tools, work at unprotected heights or be exposed to constant dust, smoke or fumes. He has a mild limitation in understanding, remembering and carrying out complex instructions; making judgments on complex work-related decisions; and interacting appropriately with the public, supervisors and coworkers.  He can use lunch or normal breaks to avoid soiling himself (Tr. at 14).  With this residual functional capacity, plaintiff is unable to perform his past relevant work as a clerk/cashier, teacher's aide, appliance assembler, fast

---

[16]In his application for disability benefits, the following remark appears:  "I applied for unemployment compensation last week." (Tr. at 140).

[17]Defined by the ALJ as constant movement for a period of not less than five minutes (Tr. at 14).

Case 6:11-cv-03066-REL   Document 16   Filed 05/30/12   Page 31 of 46

food worker, or electrical installer (Tr. at 19-20).

Step five. At 31 years of age, plaintiff is a "younger individual." With his residual functional capacity, plaintiff can work as a table worker, addresser, or general assembler, all of which are available in significant numbers in Missouri and nationally (Tr. at 20-21). Therefore, plaintiff is not disabled (Tr. at 21).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the

32

symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

Regarding his impairments, the claimant testified he has Crohn's disease, non-cancerous lymphoma, insomnia and panic attacks. He stated he lies down at least two or three times a day for 20 to 30 minutes at a time, has problems focusing and concentrating and experiences pounding in the head, nervousness, lightheadedness and shaking. He indicated he can lift a gallon of milk and on a bad day will use the restroom up to 20 times.

A November 15, 2007 clinical note indicates claimant had fairly severe Crohn's disease and had remarkable improvement on Remicade. The claimant continued to smoke. A March 17, 2008 CT of the head was negative). Claimant underwent a small bowel resection with lysis of adhesions on June 20, 2008. An August 1, 2008 progress note reveals claimant was treated for depression and was doing well. On September 8, 2008 Robert Ellis, M.D., stated claimant's PET scan and biopsy were negative. An October 15, 2008 note from Dr. Ellis, M.D., states a pathology review indicated there was no definitive evidence of lymphoma. The October 18, 2008 psychological evaluation of Craig Shifrin, Psy.D., states claimant did not have a severe enough mental disability to quality him for Medicaid. The WAIS-III indicated claimant functioned in the low end of average intellect. In a November 3, 2008 exam claimant reported he drinks alcohol two or three times a year and seldom uses marijuana. His physical exam was normal except for a midline abdominal scar and abdominal tenderness. The claimant's CBC and CMP were normal. Claimant had a history of surgery in June 2006 due to Crohn's disease and a small bowel obstruction and a September 2, 2008 CT revealed claimant had scattered intraperitoneal adenopathy. A November 26, 2008 clinical note indicates claimant was still smoking and he was strongly encouraged to quit. It was also noted that claimant's depression was improving. The December 2, 2008 clinical note indicates claimant had a generalized anxiety disorder with agoraphobia and insomnia. A December 3, 2008 CT of the abdomen and pelvis was unremarkable except for a

33

prior ileocolic reanastomosis. In a December 5, 2008 intake note claimant reported he drank heavily in the past and still drinks occasionally. He also staled he currently smokes marijuana and smoked marijuana infrequently in the past. A December 18, 2008 clinical note indicated claimant had not been taking his Methotrexate and Folate and ran out of Ciprofloxacin and had not had it refilled. The claimant was advised to stop smoking. The December 29, 2008 PET/CT scan revealed there was no evidence of metabolically active lymphoma. A December 29, 2008 clinical note indicates claimant had no significant photophobia or phonophobia, nausea, vomiting, neurologic or eye symptoms.

A February 5, 2009 EGD was consistent with a hiatal hernia. Claimant's February 23, 2009 ultrasound of the gallbladder and biliary tree was normal and the liver was slightly enlarged. A March 9, 2009 physical exam noted claimant had mild to moderate diffuse tenderness in the abdomen. April 2, 2009 x-rays of the left knee were negative. In an April 28, 2009 progress note claimant had not been taking his B-12 shots and also ran out of needles. The claimant's CRP and BMP were normal. An April 30, 2009 clinical note reveals claimant had a small area of active Crohn's disease with mild inflammation and diarrhea.

The claimant testified he continues to smoke cigarettes, but was not forthcoming in making this revelation. He has been advised on several occasional to stop smoking, but has not done so. The evidence reveals claimant continued to drink alcohol on occasion and smoke marijuana. The evidence also revealed he has an enlarged liver which is consistent with alcohol abuse. The claimant's substance abuse weighs against his credibility. The claimant has not followed medical advice with regard to his prescribed medication and treatment regimen. The claimant's voluntary noncompliance with treatment is a negative factor in determining his credibility. The claimant stated he has insomnia but there is no evidence of significant photophobia or phonophobia, nausea, vomiting, neurologic or eye symptoms. The claimant's diagnostic tests reveal he has no definitive evidence of lymphoma and no evidence of metabolically active lymphoma. The claimant does have Crohn's disease but he had remarkable improvement on Remicade and only had a small area of active Crohn's disease with mild inflammation and diarrhea. A March 26, 2009 clinical note reveals claimant was having one bowel movement a day, no rectal bleeding and had gained four pounds. In a May 1, 2009 letter Barbara Mallin, M.D., noted claimant functions fairly well when his Crohn's disease is in remission, but does not when his disease is active. The record does not indicate that he is on a specific diet to treat his Crohn's disease. His allegations regarding the use of protective pants are not credible. The results of diagnostic tests do not support his allegations regarding the severity of his disease process. The objective medical evidence does not corroborate claimant's allegations regarding the severity or intensity of his Crohn's disease or his statements concerning how active his disease is. If the claimant's symptoms were as severe as alleged one would expect there to be more clinical notes, hospitalizations or emergency room admissions for treatment of Crohn's disease. The claimant had a bowel obstruction and lysis of adhesions, but there is no medical evidence that would lead the undersigned to conclude that claimant had anything other than a full and complete recovery. No additional surgical procedures were recommended by any medical professional of record. As for claimant's alleged

34

mental impairments, the undersigned notes that Dr. Shifrin, Psy.D., stated claimant did not have a severe enough mental disability to qualify him for Medicaid. If the claimant's mental symptoms were as severe as alleged he would have provided more treatment notes, sought treatment more frequently and been involved in a more aggressive and frequent treatment regimen. The claimant did not require any hospitalizations or emergency room admissions for the treatment of his depression. The claimant does not appear to be motivated to seek treatment since he will not even get his dental problems taken care of. The claimant testified that he has paralyzing panic attacks, spends hours in bed and multiple trips to the bathroom due to Crohn's disease, but this is not consistent with the objective medical evidence. Claimant's subjective complaints are not a sufficient basis upon which to make a finding of disabled. The lack of corroborating medical evidence persuades the undersigned that claimant's allegations are not fully credible.

The claimant's SEQY reveals he has a sporadic work history with below average earnings. This evidence persuades the undersigned that claimant had little motivation to work.

* * * * *

Regarding medication, the undersigned notes that in an undated Disability Report claimant indicated he had adverse side effects to his medications consisting of injection site soreness, stomach irritation, weakness, muscle soreness and an immune deficiency. There were no independent observations from the medical professionals of record that claimant had any debilitating adverse side effects to medication. There was no indication in the evidence of record that claimant's medications were not efficacious when taken as prescribed.

As for treatment other than medication, the claimant did not submit any objective evidence that he participated in any physical therapy, counseling or psychotherapy.

As for claimant's activities of daily living, the claimant testified he vacuums and does the dishes on good days, but on a bad day sits around and goes to the bathroom as many as 20 times. In an August 14, 2007 Function Report - Adult claimant stated he takes care of his pet, does not have any problems taking care of his personal needs, prepares meals and does housecleaning. He reported he drives, walks, goes shopping, handles money, pays bills and reads. In a December 5, 2008 intake note claimant reported he had worked two jobs and had been applying for any and every job. This evidence contradicts claimant's allegations regarding limitations on his residual functional capacity and indicates his daily activities are not as limited as alleged.

(Tr. at 15-18).

35

## 1.   PRIOR WORK RECORD

The ALJ noted that plaintiff had a sporadic work history with below-average earnings. The record also establishes that plaintiff told Dr. Mallin that he lost his job as a teacher's aide due to missing "a fair amount of work over the last couple of months due to various colds. He states that when he does get a cold, it tends to linger on." This contradicts plaintiff's statement that he missed work due to Crohn's disease (a statement he made to Dr. Shifrin) and that he missed work due to side effects of his medication (plaintiff's hearing testimony was that Remicade treatments made him extremely weak, sickly, hurting, and unable to function - Tr. at 33).

Plaintiff told Dr. Shifrin that he left his job as an assistant manager at a video store because the company closed. He left his job at a pork plant after he cut his thumb and decided not to do that kind of work anymore. He left his job at a fast food restaurant for a better job. He left a job at a refrigerator factory when the factory closed. He left a job at a cable company to work for his brother. He left the job with his brother's company when his brother had to close the business. He worked for a pig farm but then moved to Springfield, Missouri. Plaintiff does not have a history of an inability to work due to his medical condition.

## 2.   DAILY ACTIVITIES

The ALJ noted that plaintiff could vacuum, do the dishes on good days, take care of his pet, take care of his personal needs, prepare meals, and do housecleaning. He reported he drives, walk, goes shopping, handles money, pays bills and reads. In December 2008 plaintiff reported that he had been applying for any and every job."

In his administrative paperwork, plaintiff reported that he tries to do light house cleaning, laundry, anything that needs to be done around the house including outside lawn care. When asked what household chores, both indoors and outdoors, that he can do, he

wrote, "Most things except for when I am in pain or sleeping from medicine." He can walk, drive a car, shop for an hour and a half, and finish what he starts.

The record is also questionable about whether plaintiff was performing work that was unreported. His earnings record shows no earnings in 2008 or 2009; however, on June 18, 2008, plaintiff told the doctor at Cox Medical Center that he "works in an auto mechanic shop" and on March 9, 2009, Dr. Field wrote, "He is currently employed."

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

In November 2007 -- after his amended alleged onset date -- plaintiff told Dr. Mallin he was having two to three bowel movements per day. His pain had "greatly improved, as well as his quality of life." In March 2008, plaintiff told Dr. Mallin he was having only two bowel movements per day. He was "only having slight periodic left sided abdominal pain."

In December 2008, a month and a half after his amended alleged onset date, plaintiff told Dr. Mallin that his pain was a 4 out of 10 and had started "two to three weeks earlier." In March 2009, he told Dr. Fields that he had some vague abdominal pain, no nausea, no vomiting, no weight loss, no fevers, no chills, no night sweats, no diarrhea. Later that month, he told Dr. Mallin that his pain was a 2 out of 10 on most days. He was having one bowel movement per day.

Plaintiff told Dr. Kreymer that curling up in a ball was the only thing that would help his pain; however, he also said he did not like or want pain medication because he was afraid of what other people would think about his using pain medicine. This is clearly inconsistent, since pain as bad as that described by plaintiff would surely negate his worry about what other people think of him.

Although the record does describe more severe pain, it was infrequent and often precipitated by plaintiff's running out of or deciding not to take his medication.

### 4.     PRECIPITATING AND AGGRAVATING FACTORS

Plaintiff admitted that smoking aggravates his condition. The record is full of doctors admonishing plaintiff to stop smoking. The record also establishes noncompliance with treatment which sometimes precipitated plaintiff's bouts with pain or diarrhea. Plaintiff testified that he suffers from insomnia, but he also testified that he drinks two cups of coffee at night.

### 5.     DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In October 2007, shortly after plaintiff began taking medication for depression, Dr. Kaufman observed that plaintiff's depressive symptoms were improving -- "His self-esteem is improving, his concentration is improving, his sleep is improving. . . . [His] sleep is actually now normal. He shows increase in psychomotor function. He actually can joke. His affect is more expanded." In April 2008, Dr. Kaufman noted that plaintiff was doing well with the medication treating his depression and insomnia. In December 2008 Dr. Kaufman noted that "Cymbalta seems to be working well for him."

Once plaintiff went off Remicade which caused his symptoms to worsen, he complained to Dr. Mallin that he had left sided abdominal pain and "four to five loose stools per day." The records show that when plaintiff complained of diarrhea, he described four to five loose stools per day, or sometimes four to six per day which contradicts his testimony that he uses the bathroom eight to ten times a day on a good day and 20 times a day on a bad day. Additionally, plaintiff's testimony that he does not wear protective undergarments seriously undermines his testimony that even on a good day he has ten bowel movements per day.

Plaintiff testified that Remicade made him extremely weak, sickly, hurting, and unable to function for a day or two at a time. However, there are is no mention of any such side effects in the medical records.

38

6.  *FUNCTIONAL RESTRICTIONS*

The record does not reflect that plaintiff was ever told not to perform any physical activities.  His surgeon completed a Medical Source Statement - Physical finding that plaintiff could lift and carry 25 pounds frequently, stand for 8 hours, and sit for 2 hours.

B.  *CREDIBILITY CONCLUSION*

In addition to the above factors, which support the ALJ's credibility finding, I note that plaintiff told Dr. Faulkner, who evaluated plaintiff in connection with a claim for Medicaid, that he was "currently on chemotherapy" which was obviously a lie.  He told Dr. Kreymer, who was evaluating him for a mental disability in connection with his application for benefits, that he was "currently on medical restrictions - not medically cleared to work at this time" -- another lie.

Plaintiff's records reveal that he was applying for jobs -- "anything and everything" -- which suggests his attempt to secure disability benefits is merely an attempt to secure an income since his intensive job search had been unsuccessful.

There are a couple medical records during which plaintiff was observed "doubled over, groaning and holding his abdomen" -- however, in one of those records the doctor notes that plaintiff ran out of his pain medicine a few days ago, the doctor called in a new prescription, but plaintiff had not bothered to check back with the pharmacy to pick up the medication.  In the other, it was noted that plaintiff was not even being treated for his Crohn's disease at the time, and Crohn's was the cause of his "writing in pain, holding his abdomen".

As mentioned above, plaintiff told one doctor that he was having regular drenching night sweats and regular diarrhea, but shortly thereafter told another doctor that he had no night sweats and no diarrhea.  It is interesting to note that plaintiff's exaggerations were to his primary care physician and what appear to be his true symptoms were relayed to the specialist

39

at Barnes Jewish Hospital who was evaluating and treating plaintiff's Crohn's disease. Plaintiff also exaggerated his symptoms to Dr. Mallin, his gastroenterologist, who did not believe plaintiff's claim of four to six weeks of diarrhea. When she questioned him about this, he admitted it had actually been a week or two. On this visit, it was also discovered that plaintiff had not been taking his prescribed medications or his B-12 injections.

As the ALJ noted, plaintiff attempted to if not lie, then to mislead the ALJ about his smoking. When confronted with the conflicting medical records, plaintiff admitted the extent of his smoking and also admitted that he was aware it significantly exacerbated his Crohn's disease.

As mentioned by the ALJ, plaintiff was constantly advised to stop smoking. Dr. Kaufman told him to quit. Dr. Mallin told him to quit. Dr. Kreymer told him to quit. Plaintiff testified that he could not afford Chantix, a medication to help with smoking cessation, but he continued to spend money on cigarettes. He smoked because he was nervous about losing his job. He smoked because he was nervous about losing his health insurance. He smoked because his niece had surgery. He smoked because he was told he had cancer. His own treating physicians repeatedly told plaintiff to stop smoking, and despite being told over and over again how it aggravated his condition, he continued to smoke cigarettes and even marijuana occasionally.

Finally, the record is full of notations of plaintiff's noncompliance. "He's supposed to be taking Prilosec over the counter for GI protection, but hasn't done this yet." Plaintiff got Dental Medicaid but had not had his dental work done despite it being cited as the cause for his inability to maintain his weight. "He also reports he had not had his Methotrexate for the last two weeks and has not been taking his Folate. His Ciprofloxacin ran out, and he has not refilled this." "He ran out of the hydrocodone a few days ago. We phone in a refill two days

40

ago, but he has not checked back with the pharmacy yet." Dr. Mallin noted that plaintiff was noncompliant with several of his prescribed medications. She noted in April 2009 that he ran out of needles needed for B-12 injections, he stopped Prednisone, and he ran out of Prilosec. When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms is not credible.

VII.    *OPINION OF BARBARA MALLIN, M.D.*

Plaintiff argues that the ALJ "failed to give any weight to the medical opinion of Barbara Mallin, M.D." According to plaintiff's brief, the opinion to which the ALJ should have given more weight came from a letter dated May 1, 2009, wherein Dr. Mallin stated that plaintiff's symptoms were mostly abdominal pain and intermittent bouts of diarrhea. His condition caused bouts of active disease with periods of remission. She stated he functioned fairly well when the Crohn's was in remission, but not when it was active.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment

41

relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

It is not exactly clear that the ALJ discounted the "opinion" of Dr. Mallin. Dr. Mallin merely said that when plaintiff's Crohn's disease is under control, he functions well. When it is not under control, he does not. The ALJ pointed out this letter in his opinion.

At 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2), a medical opinion is described as:

statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Dr. Mallin's statement that plaintiff functions better when his Crohn's disease is not active does not constitute a medical opinion. Dr. Mallin did not describe plaintiff's symptoms, did not give a prognosis, did not indicate what plaintiff can do when his disease is under control or what he can do when he is unable to "function well." She did not give any physical or mental restrictions, and she did not discuss the extent of plaintiff's noncompliance with treatment on his functional ability to perform work-related activity.

Even if Dr. Mallin's letter had included an opinion that plaintiff is unable to work (rather than merely saying that he does not function well), it would still be considered a conclusory opinion which is properly discounted. See 20 C.F.R. §§ 404.1527(d) and 416.927(d); Wildman v. Astrue, 596 F.3d 959 964 (8th Cir. 2010) (ALJ properly discounted a physician's opinion because it was conclusory, consisted of three checklist forms, cited no medical evidence, and provided little to no elaboration).

The ALJ mentioned but did not discuss the letter written by Dr. Mallin. However, the ALJ did include the treatment records of Dr. Mallin in his discussion. He did not specifically say

42

"Dr. Mallin's treatment record;" however, he did address these treatment records by date (November 15, 2007; December 18, 2008; February 5, 2009; April 28, 2009). Those records (as noted by the ALJ) indicated that plaintiff had remarkable improvement on Remicade, that he continued to smoke, that plaintiff had not been taking his Methotrexate and Folate, that plaintiff had run out of Ciprofloxacin and had not refilled it, that plaintiff was advised to stop smoking, that his EGD was consistent with a hiatal hernia, that plaintiff had not been taking his B-12 shots, that plaintiff had run out of needles for his B-12 shots, that his CRP and BMP were normal.

Because Dr. Mallin's treatment records were analyzed by the ALJ, and because her letter did not include a medical opinion, the ALJ did not err in failing to give weight to Dr. Mallin's statement that plaintiff functions better when his Crohn's disease is not flaring up.

## VIII.   PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

At step four of the sequential evaluation process, after considering all the relevant evidence, the ALJ found that plaintiff retained the residual functional capacity to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), subject to specific physical and mental limitations. Plaintiff argues that the ALJ committed reversible error in that he did not consider any medical opinions in deriving his residual functional capacity determination.

The ALJ thoroughly reviewed all of the medical records. Even though Dr. Kaufman was a treating source, the ALJ gave little weight to his opinion. The ALJ noted that Dr. Kaufman's opinion that plaintiff would need to lie down or recline every day for relief of pain was conclusory and inconsistent with the signs and findings in plaintiff's medical records, as well as plaintiff's noncompliance with treatment and medical advice and his substance abuse. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to

43

Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence."). An ALJ may discount, or even completely reject, the opinion of a treating physician if it is inconsistent with the record as a whole. McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (citing Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008)). The ALJ assigned "great weight" to the opinion of Dr. Rasque that plaintiff could perform less than the full range of light work. He found this consistent with the signs and findings in the physical examination of record and the results of diagnostic tests. But he did not agree with Dr. Rasque's finding that plaintiff was limited to sitting for a total of two hours with breaks during a workday as such a limitation was not substantiated by the medical evidence of record or plaintiff's description of his activities of daily living.

The ALJ found that the opinion of Dorinda Faulkner, M.D., was entitled to very little weight. She evaluated plaintiff's eligibility for Medicaid benefits. She concluded on the basis of the information provided to her and her evaluation of plaintiff that he was "functionally disabled for work at this time [November 2008]." The ALJ properly discounted this opinion as conclusory and inconsistent with the signs and findings in plaintiff's medical records. Moreover, Dr. Faulkner's conclusion that plaintiff was "functionally disabled" "gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).

The record also contains opinions from Dr. Kaufman, Dr. Shifrin, and Dr. Kreymer regarding limitations imposed by plaintiff's mental impairments, reactive depression and adjustment disorder with depressed features. Dr. Shifrin evaluated plaintiff's eligibility for Medicaid on the basis of his mental functioning. The ALJ properly rejected Dr. Shifrin's opinion that plaintiff's physical impairments caused "extreme" limitations in two functional

44

areas. These were outside his area of expertise as a psychologist. See 20 C.F.R.§§ 404.1527(d)(5) and 416.927(d)(5). Moreover, as the ALJ pointed out, such findings suggesting total disability were inconsistent with Dr. Shifrin's conclusion that plaintiff did not "have a severe enough mental disability that would qualify him for receiving Medicaid support." See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (the ALJ may discount or disregard such an opinion if the treating physician has offered inconsistent opinions). Dr. Shifrin's recommendation that plaintiff be evaluated as to the effect of his physical impairments demonstrates that Dr. Shifrin recognized his lack of expertise to make such findings. More weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a treating source who is not a specialist. Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998).

The record contains two opinions by Dr. Kaufman regarding plaintiff's mental functioning. In the more recent assessment, done in December 2008, Dr. Kaufman found that plaintiff had "extreme" limitations in every functional area evaluated. The ALJ properly rejected this, noting among other things that it was inconsistent with Dr. Shifrin's opinion that plaintiff's mental impairments were not severe enough to qualify him for Medicaid.

Dr. Kreymer submitted the most recent assessment of plaintiff's mental limitations. While he found that plaintiff had "moderate" limitations in some areas, he found no "marked" or "extreme" limitations. It should be noted that Dr. Kreymer's opinion was based upon a single encounter with plaintiff, in December 2008. Although the intent was to enter into a treating relationship, plaintiff testified that he never returned because he had a "religious conflict" with Dr. Kreymer. The ALJ assigned this opinion "little weight" because it was inconsistent with plaintiff's mental health treatment history and with Dr. Shifrin's opinion that plaintiff's mental impairments were not severe enough to qualify him for Medicaid.

45

Plaintiff argues that the ALJ erred in not conducting a function-by-function analysis, as required by Social Security Ruling 96-8p. In <u>McCoy v. Astrue</u>, 648 F.3d 605, 615 (8th Cir. 2011), the Eighth Circuit noted the plaintiff's argument that it was error for the ALJ to fail to make explicit findings regarding the plaintiff's ability to stoop, stand, walk, handle, and reach. "We review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation." In this case, the ALJ's decision, reflecting the comprehensive nature of his review of the evidence, reasonably suggests that he did not disregard evidence or ignore potential limitations.

## IX. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 29, 2012

46